JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Robert Layton and Krysta Layton (his wife); and Shawn Layton

**(b)** County of Residence of First Listed Plaintiff: **Gloucester County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, Email and Telephone Number)*
Joseph Marano Layser & Freiwald, PC
251 S. White Horse Pk., Ste. 100, Audubon NJ 08106
jm@layserfreiwald.com 856-858-6606

## DEFENDANTS
Consolidated Rail Corp. a/k/a Conrail, Norfolk Southern Railway Co., Norfolk Southern Corp., CSX Corp. and/or CSX Transportation, Inc., Jane and/or John Does 1-25 and ABC Corp. 1-25

County of Residence of First Listed Defendant: **Philadelphia, PA**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
David A. Damico Burns White, LLC
106 Isabella Street, Pittsburgh, PA 15212
(412) 995-3206

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | | | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | / ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USCA §1332
Brief description of cause:
Toxic Exposure

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE: 11-25-14
SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT LAYTON and<br>KRYSTA LAYTON (his wife); and<br>SHAWN LAYTON<br>      Plaintiffs,<br><br>v.<br><br>CONSOLIDATED RAIL<br>CORPORATION a/k/a CONRAIL;<br>NORFOLK SOUTHERN RAILWAY<br>COMPANY; NORFOLK SOUTHERN<br>CORPORATION; CSX CORPORATION<br>AND/OR CSX TRANSPORTATION, INC.<br>JANE and/or JOHN DOES 1-25 and<br>ABC Corporation 1-25<br>      Defendants. | CIVIL ACTION NO:<br><br><br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

This action is brought on behalf of individuals who were exposed to vinyl chloride, a known human carcinogen, in the immediate aftermath of a train derailment in Paulsboro, New Jersey on November 30, 2012. The derailment was entirely preventable and was the direct result of the combined careless and reckless conduct of Defendants, as detailed in this Complaint.

I.    PARTIES

    1.    Plaintiff Robert Layton was born on June 8, 1982 and is an individual citizen and resident of the State of New Jersey, residing therein in Sewell, New Jersey, Gloucester County.

    2.    Mr. Layton was a first responder working for the Mantua Township Police Department. He responded to the scene on the date of incident and was stationed immediately adjacent to the bridge and the train. He was on site for five to six hours and was exposed throughout his duty.

3. Plaintiff Krysta Layton is an individual citizen and resident of the State of New Jersey, therein in Sewell, New Jersey, Gloucester County. She was and is the wife of Plaintiff Robert Layton.

4. Plaintiff Shawn Layton was born on August 17, 1991 and is an individual citizen and resident of the State of New Jersey, therein in Sewell, New Jersey, Gloucester County.

5. Mr. Layton was a first responder working for the Mantua Township Fire Department. He was stationed in the "hot zone" and helped the Paulsboro Fire Department establish the "Neptune system" on the Mantua Creek. He was there for several hours on the date of incident. Mr. Layton also reported to the scene on December 2, 2012 to December 14, 2012.

6. Defendant Consolidated Rail Corporation, a/k/a CONRAIL, is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business and/or corporate headquarters located at 1717 Arch Street, 32nd Floor, Philadelphia, PA. 19103.

7. Defendant Consolidated Rail Corporation, a/k/a CONRAIL, at all relevant times acted on its own and through the actions of its agents, employees, servants and/or ostensible agents and owed a duty of care to Plaintiffs.

8. Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation, are corporations duly organized and existing under and by virtue of the laws of the State of Virginia, with its principal place of business located at Three Commercial Place, Norfolk, VA 23510.

9. Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation, at all relevant times acted on its own and through the actions of its agents, employees, servants and/or ostensible agents and owe a duty of care to Plaintiffs.

10. Defendants CSX Corporation and/or CSX Transportation, Inc. are corporations duly organized and existing under and by virtue of the laws of a state of Virginia with its principal place of business and/or corporate headquarters located in Jacksonville, Florida and an office for the service of legal process at 2704 commerce Drive, Ste. B., Harrisburg, PA 17110 and with a registered agent as CT Corporation System, 1635 Market Street, Philadelphia, PA 19102 and its principal place of business at 500 Water Street, 15th Floor, Jacksonville, Florida 32202.

11. Defendants CSX Corporation and/or CSX Transportation, Inc. at all relevant times acted through its agents, employees, servants and/or ostensible agents and owed a duty of care to Plaintiffs.

12. At all relevant times, John and/or Jane Does 1-25 were ostensible agents, servants and/or employees of Defendants or are individuals who in addition to the Defendants named herein are responsible for Plaintiffs' injuries.

13. At all relevant times, Defendants ABC Corporation 1-25, are corporations who, in addition to the Defendants named herein are responsible for Plaintiffs injuries.

14. Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company, Conrail, Norfolk Southern Corporation, CSX Corporation, CSX Transportation, Inc., John and/or Jane Does 1-25 (fictitious names) and ABC Corporations 1-25 (fictitious names), owned, controlled, managed and/or operated the Jefferson Street Bridge and the train that derailed, causing massive quantities of toxic chemicals to spill and release into the environment.

15. Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company, Conrail, Norfolk Southern Corporation, CSX Corporation, CSX Transportation, Inc., John and/or Jane Does 1-25 (fictitious names) and ABC Corporations 1-25 (fictitious names),should have known

and did know of defects and hazards on the Jefferson Street Bridge that created an unreasonable risk of a tanker car derailment well before the date of the incident.

16. Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company, Conrail, Norfolk Southern Corporation, CSX Corporation, CSX Transportation, Inc., John and/or Jane Does 1-25 (fictitious names) and ABC Corporations 1-25 (fictitious names), through their agents, servants, employees and apparent employees, should have known and did know that there was an unreasonable risk and danger of harm to the surrounding population if a train car derailed and released its toxic chemical contents into the environment.

17. Defendants Norfolk Southern Railway Company, Conrail, Norfolk Southern Corporation, CSX Corporation, CSX Transportation, Inc., John and/or Jane Does 1-25 (fictitious names) and ABC Corporations 1-25 (fictitious names) were negligent, careless and reckless in their conduct, as set forth in more detail below.

18. Because of the highly hazardous and usually dangerous nature of the materials being transported across the Jefferson Street Bridge, Defendants are strictly liable for the harms that resulted from the November 30 train derailment, as set forth in more detail below.

19. At all times relevant hereto, all Defendants acted through their respective agents, servants, workmen and/or employees, who were acting in the course and scope of their employment and service.

## II.   JURISDICTION

20. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

21. This Court has jurisdiction over the parties by virtue of diversity of citizenship

pursuant to 28 U.S.C. § 1332.

## III. FACTS UNDERLYING ALL CLAIMS

22. On or about the morning of November 30, 2012, Defendants owned, operated, controlled, managed and maintained a certain bridge which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey known as the Jefferson Street Bridge.

23. The Jefferson Street Bridge in fact had been owned, operated, controlled, managed and maintained by Defendants for a significant amount of time before November 30, 2012.

24. On November 30, 2012 at approximately 7:00 a.m., a railroad train operated by various Defendants derailed while crossing the Jefferson Street Bridge. The bridge locking mechanism was not fully engaged before the train was operated onto the bridge, causing the rails to slip out of place which in turn caused the train to derail, sending four railroad tank cars into the creek.

25. The derailment caused a massive spill of vinyl chloride from at least one of the damaged tank cars. Vinyl chloride is a highly a potent human carcinogen.

26. The vinyl chloride tank car in question originated at an OxyVinyls facility in Dallas Texas, and traveled through Philadelphia, across to Delair Bridge (adjacent to the Betsy Ross Bridge, and co-owned by Defendants CSX and NSRC) into New Jersey, on its way to Paulsboro.

27. The bridge in question has had a significant history of failure. A similar derailment and collapse occurred in the same place on August 23, 2009. Even after purported repairs to the bridge, nearby residents reported to various Defendants prior to the November 30, 2012 derailment that they heard strange noises coming from the bridge, including a loud "bang" when no train was on it.

28. The Jefferson Street Bridge was built in approximately 1873.

29. The Jefferson Street Bridge is a "swing bridge" and can be positioned to permit water travel along the Mantua Creek or to permit rail traffic over the Mantua Creek.

30. A train cannot safely cross the Jefferson Street Bridge unless the bridge aligns and locks with the adjacent rails. A green light signal indicates the bridge is locked and a red light signal indicates it is not locked.

31. Prior to November 30, 2012, over roughly a one-year period, Defendants servants, workmen received no fewer than 23 "trouble tickets" reporting that the Jefferson Street Bridge had malfunctioned and/or required maintenance.

32. During the period from October 27, 2012 to the time of the derailment on November 30, 2012, Defendants, through their respective agents, servants, workmen and/or employees, received at least nine "trouble tickets" reporting the improper operation of the Jefferson Street Bridge and/or malfunctioning of the bridge.

33. On November 19, 2012, just days before the accident, a rail crew reported to Defendants that the Jefferson Street Bridge had malfunctioned in that the track on the bridge had failed to properly connect and lock with the track on either side of the bridge.

34. Approximately eight hours before the accident, another train crew reported to Defendants that the Jefferson Street Bridge had malfunctioned and had failed to operate properly.

35. Defendants' own operating procedures required inspection of the Jefferson Street Bridge every three months.

36. A mechanical inspection of the subject bridge should have been performed in or about September 2012.

37. Defendants failed to perform the mandated inspection of the bridge in September 2012 and/or failed to perform a proper inspection.

38. In spite of this litany of problems with the bridge, Defendants continued to use the bridge for freight trains of 80 cars or more transporting hazardous and toxic chemicals through a populated area. In addition, employees of Conrail, among other employees or agents of Defendants, signed off on the continued use of the swing bridge.

39. Prior to the November 30 derailment, Defendants had employed an operator whose job was to move the Jefferson Street Bridge into the proper position, lock the bridge to the tracks on either side of it, and inspect to make certain that the bridge was properly aligned and locked with the adjacent rails before permitting any trains to move over the bridge.

40. Prior to the derailment, in an apparently reckless cost cutting measure, Defendants eliminated the bridge operator position and replaced that individual with an electronic/mechanical system.

41. On the morning of November 30, 2012, one of Defendants' train crews attempted to remotely move the Jefferson Street Bridge into its closed position to enable a multi-car train to cross the Mantua Creek and further proceeded to remotely lock the tracks on the bridge to the tracks on either side of the bridge.

42. The green and red light indicators failed to work properly at the time of the incident. Even though the train crew had used the remote control to align and lock the bridge, the signal light remained red.

43. Defendants' train crew contacted the dispatcher and requested permission to cross the bridge despite the fact that signal was red.

7

44. On the morning of November 30, 2012, despite the presence of a red signal, the Defendants' dispatcher authorized the same crew to cross the Jefferson Street Bridge.

45. As the train crossed the Jefferson Street Bridge, due to the negligence and recklessness of the Defendants, the train derailed. As a result of its derailing, several cars were caused to fall in the Mantua Creek and be breached and their contents released.

46. One of the tank cars that derailed was carrying vinyl chloride, massive quantities of which were released into both the water and the atmosphere.

47. Approximately 180,000 pounds of the vinyl chloride were released into the environment.

48. The entire surrounding neighborhood became engulfed in a toxic cloud of vinyl chloride gas. The vinyl chloride fog was so thick that it was difficult to see through it.

49. Vinyl chloride is flammable, explosive and a known human carcinogen that is known to cause angiosarcoma of the liver, hepatocellular carcinoma, and other cancers, including brain cancer.

50. Acute exposure to vinyl chloride harms the central nervous system causing dizziness, drowsiness, headaches, giddiness, loss of consciousness, lung and kidney irritation and inhibition of blood clotting.

51. As a result of the chemical spill, the odor of vinyl chloride permeated the area: Dozens of people required treatment at a local hospital. Hundreds, if not thousands, were evacuated from their houses, from business and from schools.

52. Just one pound of vinyl chloride can contaminate five acres to a level of 2 ppm. The

release of approximately 180,000 pounds of vinyl chloride had to result in levels well in excess of 5,000 ppm. It is likely that everyone within a one-mile radius of the train derailment was exposed to far greater than 5 ppm averaged over a period far greater than 15 minutes and far more than 1 ppm averaged over an 8-hour period.

53. Reports indicate that efforts to remove the vinyl chloride from the remaining rail cars was not completed for several days and that significantly elevated readings of vinyl chloride in the air were detected for at least five days after the incident.

54. As transporters of hazardous chemicals through populated areas, the Defendants had a duty of care to have in place an emergency response plan that would protect the safety of nearby residents in the event of a derailment or other chemical spill.

55. The events of November 30, 2012 and the aftermath demonstrate that the Defendants either had no plan whatsoever, or, they had a plan, it was either totally inadequate or completely ignored.

56. In spite of the likelihood that serious vinyl chloride contamination would spread over a mile from the site, no evacuation was ordered immediately, and when one was ordered it was actually far less than half a mile from the derailment site.

57. No protective equipment was made available to the first responder Plaintiffs until days after the derailment.

58. Even after breathing equipment was made available to these in close proximity to the spill area, including the first responders, on Tuesday, December 4, 2012, the equipment was useless because no filters were provided.

59. In addition to failing to provide appropriate personal protective equipment,

9

Defendants failed to provide proper environmental and biological monitoring.

60. At all times, Defendants, their representatives and contractors, including Center for Toxicology and Environmental Health ("CTEH"), downplayed the significance of the amount and toxicity of the vinyl chloride released.

61. Defendants and their representatives and contractors misled the public about the extent of the exposure. Initial reports stated that by 10:30 a.m. on November 30, 2012 the vinyl chloride had "dissipated". On the contrary, early in the morning of December 1, fire fighters reported that they had to spray water on the breached car in order to keep the vinyl chloride from rising into the air and that "pockets" were found in which vinyl chloride measured as high as 350 ppm.

62. The November 30, 2012 derailment was caused by the negligence and recklessness of Defendants.

63. As a result of the negligence, carelessness, and recklessness of Defendants, each of the Plaintiffs in this action was exposed to dangerous and harmful levels of vinyl chloride and other dangerous and toxic fumes and substances released into the water and the atmosphere by the rail cars that derailed and/or fell off of Jefferson Street Bridge, or otherwise suffered a loss of spousal consortium.

64. The injuries Plaintiffs have suffered and will suffer were caused solely and exclusively by Defendants and were in no manner whatsoever caused or contributed to by any act or omission on the part of Plaintiffs.

65. Defendants' actions/inactions as well as Defendants' recklessness have increased the risk of harm to Plaintiffs.

66. As a result of the derailment, Plaintiffs sustained various physical injuries, including damage to their eyes, respiratory systems, neurological injuries, injuries to their internal organs, pain and suffering, and mental anguish and distress, and have been and will be required to incur medical expenses on behalf of themselves and on behalf of their spouse, and otherwise suffered a loss of spousal consortium.

67. As a result of the derailment, Plaintiffs sustained various injuries to their bodies, including, but at this time not limited to, their bones, cells, tissues, nerves, muscles and functions. Plaintiffs sustained injuries to their eyes, skin, respiratory system, neurological system, internal organs as well as increased likelihood of developing cancer and diseases of the blood, the fears associated with same; and severe physical, emotional and psychological pain and suffering and a loss of spousal consortium. Some or all of the above injuries are or may be permanent in nature.

68. As a result of the derailment, Plaintiffs have suffered a loss and impairment of earnings and earning power and will suffer the same for an indefinite time in the future and will have to continue to expend large sums of money in the future to treat the aforesaid injuries, and will continue to suffer a loss of spousal consortium.

69. As a result of the derailment, Plaintiffs have suffered a loss of the value of their real and personal property, have suffered a diminution of value of their real and personal property, and will suffer for same an indefinite time in the future.

### COUNT I - NEGLIGENCE
### ALL PLAINTIFFS VS. ALL DEFENDANTS

70. Plaintiffs incorporate by reference the allegations above as though fully set forth here.

71. Defendants' wrongful conduct included the following:

11

a. Failure to properly inspect the Jefferson Street Bridge;

b. Failure to properly discover the defective, malfunctioning and unsafe condition of the Jefferson Street Bridge;

c. Failing to repair the Jefferson Street Bridge;

d. Failing to properly maintain Jefferson Street Bridge;

e. Failing to heed prior complaints that the Jefferson Street Bridge failed to operate properly, failed to properly align and failed to properly lock;

f. Failing to heed the complaints of other crews both 10 days before this derailment and just hours before this derailment concerning the failure of the Jefferson Street Bridge to properly operate, properly align and properly lock;

g. Permitting a train to cross the Jefferson Street Bridge even though there was a red signal that indicated that the bridge was not properly aligned and/or was not properly locked;

h. Failure to have properly trained personnel to detect the condition of the Jefferson Street Bridge, and whether the bridge was properly aligned and locked, prior to permitting the train to cross despite a red signal;

i. Failure to employ a bridge operator who was trained to operate the Paulsboro bridge and to inspect it prior to permitting to cross;

j. Failing to perform required inspections on the Jefferson Street Bridge;

k. Permitting highly hazardous, toxic, extremely dangerous, poisonous substances and carcinogenic substances to be transported across the Jefferson Street Bridge despite the presence of a red signal indicating that the bridge was not properly aligned and/or locked;

l. Failing to take reasonable, necessary and proper precautions for the safety of those individuals living, working, and otherwise located in the vicinity of the Jefferson Street Bridge;

m. Failing to warn those individuals living, working, and otherwise located near the Jefferson Street Bridge that hazardous substances were being transported across the bridge despite Defendants knowing it was unsafe for a train to cross the bridge under the circumstances existing on the morning of November 30, 2012;

    n.    Failure to take necessary precautions despite engaging in an ultra-hazardous activity;

    o.    Failure to properly inspect, maintain and repair the signal system associated with the Jefferson Street Bridge;

    p.    Failure to comply with the Defendants' own safety, operating and other rules, procedures and regulations;

    q.    Failure to have a qualified bridge mechanic or engineer, signal operator or signal department personnel, or maintenance of way personnel inspect the bridge and the tracks before permitting the train to travel over the Paulsboro bridge despite the red signal;

    r.    Permitting untrained and unqualified personnel to make the decision to authorize train traffic to proceed over the bridge despite the presence of the red signal;

    s.    Failure to heed the recommendations of agents, servants, contractors, consultants, and/or employees to only operate the bridge in a closed position until all trouble tickets could be cleared; and

    t.    Failure to utilize an alternative safer design of bridge for the safe handling of ultra-hazardous materials and high train traffic through the Borough of Paulsboro.

72.    The derailment, bridge collapse, and release of vinyl chloride was caused by the negligence of the Defendants.

73.    Upon information and belief, Plaintiffs aver that the derailment, bridge collapse, and release of vinyl chloride were caused by the negligence of the Defendants as set forth above.

74.    In addition, and in the alternative, the derailment, bridge collapse, and release of vinyl chloride was caused by defective equipment, which was in the care, custody and control of Defendants. Defendants knew or should have known of these defects and are, therefore, liable for them.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants, jointly

and severally, and ask the Court to award them compensatory damages, plus such interest and costs as are allowed by law, together with such other damages as this Court deems equitable and just.

### COUNT II - STRICT LIABILITY
### ALL PLAINTIFFS vs. ALL DEFENDANTS

75. Plaintiffs incorporate by reference the allegations contained above as those fully set forth here.

76. At all relevant times, Defendants were responsible for the proper transportation and distribution of hazardous substances across the Jefferson Street Bridge.

77. At all relevant times, Plaintiffs incurred injuries and various costs relating to their exposures to vinyl chloride and other hazardous substance.

78. As a proximate result of Defendants actions and failure to act, Plaintiffs have been exposed to dangerous and harmful levels of vinyl chloride and, therefore, are placed at a significantly increased risk of contracting serious diseases, e.g., angiosarcoma of the liver, liver cancer, brain cancer, Raynaud's syndrome, and other cancers. Further Plaintiffs have suffered severe physical, emotional and psychological pain and suffering as described throughout this Complaint.

79. Defendants are strictly liable for the injuries and losses Plaintiffs have sustained.

**WHEREFORE,** Plaintiffs demand compensatory damages, reasonable other damages, together with interest, attorneys' fees and costs of suit.

### COUNT III - RECKLESSNESS
### ALL PLAINTIFFS VS. ALL DEFENDANTS

80. Plaintiffs incorporate by reference the allegations contained above as though fully set forth here.

81. As described above, Defendants acted in an outrageous, willful and grossly careless

and negligent manner, with unreasonable disregard for the safety of persons and property within the vicinity of the Jefferson Street Bridge.

82. Defendants acted with a wanton disregard and reckless indifference to Plaintiffs' rights and welfare, safety, health and well-being.

83. As a result of the outrageous, willful, reckless and grossly careless conduct of Defendants, in which there was a wanton disregard and reckless indifference to Plaintiffs' rights and welfare, Plaintiffs are entitled to punitive damages.

**WHEREFORE,** Plaintiffs demand punitive damages, together with interest, attorneys' fees and costs of suit.

## COUNT IV - MEDICAL MONITORING
## ALL PLAINTIFFS VS. ALL DEFENDANTS

84. Plaintiffs incorporate by reference the allegations contained above as though fully set forth here.

85. As a result of Defendants' misconduct, Plaintiffs were exposed to significant quantities of vinyl chloride, a potent human carcinogen. Though the potential consequences of this exposure can be severe, even life-threatening, they often do not manifest themselves immediately.

86. As a proximate result of Defendants' actions and failure to act, as well as Defendants' recklessness, Plaintiffs have been placed at a significantly increased risk of contracting serious diseases, *e.g.*, angiosarcoma of the liver, liver cancer, brain cancer, Raynaud's syndrome, and other diseases. There are medical monitoring procedures that can alert persons, like Plaintiffs, to the early developments of such serious and life threatening diseases. This monitoring is beneficial and reasonably necessary according to contemporary medical and scientific principles.

87.  As a result of Defendants' misconduct, as set forth in this Complaint, Plaintiffs experienced a significant exposure to vinyl chloride and are entitled to a medical monitoring program funded by Defendants, under court supervision, including but not limited to, testing and screening for latent medical conditions, in addition to costs and reasonable attorneys' fees.

88.  Plaintiffs have no adequate remedy at law in that monetary damages alone do not compensate for their wrongful exposure to vinyl chloride and a monitoring program that ascertains the presence of injury and aids in early detection and treatment can prevent greater harms.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants, jointly and severally, and ask the Court to award them equitable relief of medical services, compensatory and damages, plus such interest and costs as are allowed by law, together with such damages as this Court deems equitable and just.

**LAYSER & FREIWALD, P.C.**

By:  s/Joseph Marano
AARON J. FREIWALD, ESQUIRE
JOSEPH MARANO, ESQUIRE
Attorneys for Plaintiffs

**HOFFMAN & DIMUZIO**

By:  s/Scott C. McKinley
SCOTT C. MCKINLEY, ESQUIRE
Attorney for Plaintiffs

Dated: November 25, 2014